UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

JEREMIAH ROSS, *personal representative of the Estate of Christina Ryan, deceased*,

Plaintiff,

vs.

CORRECT CARE SOLUTIONS, LLC, *a Kansas corporation*; DR. VIVEK SHAH; *an individual*; CLINT BANNING, *an individual*; KATHI WEAVER, *an individual*; RACHEL CRESS, *an individual*; AMBER DARNELL, *an individual*; DR. PAUL BILDER, *an individual*; and WELLPATH LIQUIDATING TRUST,

Defendants.

Case No. 6:21-cv-01576-MTK

**OPINION AND ORDER**

---

**KASUBHAI,** United States Magistrate Judge:

Plaintiff Jeremiah Ross, personal representative of the Estate of the deceased Christina Ryan, ("Plaintiff") brings this action (ECF No. 36) alleging civil rights violations under 42 U.S.C. § 1983 against the healthcare provider Wellpath LLC, formerly Correct Care Solutions, LLC, ("Wellpath") and several of its employee healthcare workers, Clint Banning, Kathleen Weaver, Rachel Cress, Amber Darnell, Dr. Vivek Shah, and Dr. Paul Bilder (collectively, "Defendants"). Defendants moved for summary judgment on April 22, 2024. ECF No. 83. For

the reasons below, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## BACKGROUND

In October 2019, Defendant Wellpath provided medical services at the Coos County Jail. During that time, Defendant Dr. Paul Bilder, the Medical Director, was scheduled to go to the jail two hours per week. *See* Bilder Dep. at 80-81 (Ex. 1 to Devlin Decl.); *see also* Litchfield Decl., Ex. 1, at 18. Defendant Clint Banning, a nurse practitioner, was scheduled to go four hours per week. *See* Litchfield Decl., Ex. 1, at 18. Defendant Dr. Vivek Shah, the Regional Medical Director, was Dr. Bilder and Mr. Banning's "clinical supervisor." *See* Shah Dep. at 22, 33, 40-41 (Ex. 6 to Devlin Decl.); *see also* Small Dep. at 26-27 (Ex. 7 to Devlin Decl.). Defendant Kathleen Weaver, a registered nurse and the Health Services Administrator ("HSA"), ran the day-to-day operations. *See* Cress Dep. at 48 (Ex. 4 to Devlin Decl.). Defendant Rachel Cress, a registered nurse, worked shifts at the jail in the evening and on the weekends. *See id.* at 50-52. Defendant Amber Darnell, who had EMT training, worked as an administrative assistant. Ms. Weaver supervised Ms. Cress and Ms. Darnell. *See* Weaver Dep. at 91-92, 126 (Ex. 5 to Devlin Decl.).

### I. Christina Ryan Is Booked Into The Coos County Jail.

On October 30, 2019, Christina Ryan went to Coquille Valley Hospital complaining of shortness of breath and anxiety. The staff suspected that Ms. Ryan had consumed drugs and contacted the Coquille Police Department after finding a gun in Ms. Ryan's bag. Earlier that morning, Ms. Ryan's former boyfriend, Bobby Storts, told Officer Harzan that Ms. Ryan had stolen his gun. Officer Harzan arrested Ms. Ryan at the hospital and transported her to the jail.

Sergeant Donovan Delossantos and Deputy Kristy Harvey met Ms. Ryan in the sally port. Ms. Ryan was cooperative, spoke with the deputies, and walked under her own power. *See* Declaration of Chad Stavley in Support of Memorandum in Opposition to Motion for Summary Judgment (describing videotape of Ms. Ryan's time while at Coos County jail) (hereinafter "video").[1] Ms. Ryan entered the booking area at 1:41 p.m. She told the deputies that she had taken methamphetamine that morning. She stood at the booking counter without assistance. *See* video. Sergeant Delossantos noted that Ms. Ryan appeared to be under the influence of methamphetamine. *See* Mede Dep., Ex. 9, at WP_Ryan_002695 (Ex. 9 to Devlin Decl.). Ms. Ryan walked without assistance to Holding Cell 2 and removed her shoes. *See* video. Ms. Ryan was able to sit on the bench, fill a water cup, and use the toilet in the cell. *See* video.

At 3:08 p.m., Kathleen Weaver walked through booking. *See* video. Ms. Ryan was making squawking noises, but Ms. Weaver did not look into her cell. A few minutes later, Ms. Weaver walked through booking again and did not look into Ms. Ryan's cell.

At 3:34 p.m., Amber Darnell entered booking. Sergeant Delossantos told Ms. Darnell that Ms. Ryan had been "asking for medical…." Ms. Darnell looked into Ms. Ryan's cell. The deputies informed her that Ms. Ryan was on drugs. Ms. Darnell left booking less than three minutes later. She never spoke with Ms. Ryan, who was still making squawking noises. *See* video. Ms. Ryan was moving around on the floor of the cell. *See* video.

At 4:07 p.m., Ms. Darnell returned to booking without looking into Ms. Ryan's cell. *See* video. Ms. Ryan was on the floor of the cell. *See* video. Ms. Darnell testified: "I do remember

[1] Ms. Ryan's entire time at the Coos County jail is captured on video, except for the period of time she was in the shower. The veracity of the video recordings are not disputed. To the extent facts appearing on the videos are described below, they are cited to as "video" and are relied on as undisputed.

looking into her cell and just finding a little empathy for her, knowing that she's in rough shape." *See* Darnell Dep. at 85 (Ex. 10 to Devlin Decl.). Ms. Darnell did not remember whether she spoke with Ms. Weaver after she saw Ms. Ryan. *See id*. at 97. Dr. Vivek Shah said that "clearly, Ms. Ryan seems like somebody … who needs attention …." *See* Shah Dep. at 194-195 (Ex. 6 to Devlin Decl.). He also shared that he would have expected Ms. Darnell to contact a nurse or look into Ms. Ryan's cell. *See id*. at 196-97. Wellpath's 30(b)(6) witness, Andrew Small, testified that, per Wellpath policy, Ms. Darnell did not have to contact a nurse. *See* Small Dep. at 69-70 (Ex. 7 to Devlin Decl.).

At 4:22 p.m., Ms. Darnell returned to booking. She did not look into Ms. Ryan's cell, even though Ms. Ryan had resumed her squawking noises. *See* video. Ms. Ryan was rolling around on the floor. *See* video. Again, Dr. Shah testified that Ms. Darnell should have looked into Ms. Ryan's cell, and agreed that it would not take medical training to know that Ms. Ryan was someone who needed medical attention. *See id*. at 198-200. After reviewing the videos at his deposition, Mr. Banning added that there were more resources at a hospital to help someone in Ms. Ryan's condition. *See* Banning Dep. at 155-56 (Ex. 2 to Devlin Decl.).

At 4:35 p.m., Ms. Darnell returned to booking. She did not look into Ms. Ryan's cell, even though Ms. Ryan was still squawking. *See* video. Ms. Ryan was rolling around on the floor. *See* video. Ms. Darnell then left the jail because her shift had ended.

## II. Rachel Cress Interacts With Christina Ryan

At 4:42 p.m., Rachel Cress entered booking. *See* video. Sergeant Delossantos told Ms. Cress that Ms. Ryan "just fell asleep" and has "literally just been going like this throughout her cell for, like, a couple of hours." Ms. Cress responded: "On her feet?" Deputy Harvey said: "No. Laying. Rolling. Upside down." *Id.*

The deputies opened the cell door for less than four minutes. *See* video. Ms. Ryan was laying on the ground. Ms. Cress placed a blood pressure cuff on Ms. Ryan's wrist, placed a pulse oximeter on her finger, and checked her pulse. Ms. Ryan did not move or respond when Ms. Cress touched her. Once Ms. Cress removed the wrist cuff and pulse oximeter, the deputies tried to move Ms. Ryan onto the mattress. Ms. Ryan responded by sitting up, making jerky movements, saying "What?" and "No," and uttering incoherent noises.

After the deputies closed the cell door, Ms. Cress asked them whether Ms. Ryan could "still use words." The deputies responded that "she did when she came in." Sergeant Delossantos told Ms. Cress: "When she came in, she was fine, coherent, she answered pretty much all the questions I asked her." Deputy Harvey added: "She has a shit ton of meth." Sergeant Delossantos said: "She said she did meth this morning. I think she's just super, super high." Ms. Cress left the booking area at 4:49 p.m.

Ms. Cress wrote the following chart note about this encounter with Ms. Ryan:

> PC [phone call] from Booking, Requesting medical to check on IM [inmate] as she has been constantly moving around cell in an anguished-type of way. At this time IM is quiet, VSS [vital signs stable] @ 108/76 p 91 RA [room air] Sats 96% R 16; Deputies help to reposition IM, who becomes frightened and again begins moving around cell, but not as much as previously. Will continue to monitor; Deputies will let medical staff know if SxS [signs and symptoms] worsen.

*See* Mede Ex. 9, at WP_Ryan_002696 (Ex. 9 to Devlin Decl.); *see also* Cress Dep. at 93-94 (Ex. 4 to Devlin Decl.).

Ms. Cress explained that she did not contact Dr. Bilder or Mr. Banning about Ms. Ryan "[b]ecause I wasn't worried about her." *See* Cress Dep. at 136 (Ex. 4 to Devlin Decl.). She added: "I went down because they asked me to. If I'd walked by and looked in the window and seen her moving around like that, I wouldn't have stopped and dropped and did her vital signs." *See id.* at 137, 154.

Ms. Weaver testified that Ms. Cress's encounter with Ms. Ryan was acceptable. *See* Weaver Dep. at 106 (Ex. 5 to Devlin Decl.). Asked if Ms. Cress should have contacted Mr. Banning, Ms. Weaver responded: "What would she have said? ... [That someone is] rolling around in the cell and is high on drugs?" *See id.* Dr. Shah testified that Ms. Cress should have spent more time with Ms. Ryan and done a more thorough evaluation. *See* Shah Dep. at 205-209 (Ex. 6 to Devlin Decl.). He explained that Ms. Cress "should have – could have called [a] provider, presented the case and got an order to send the patient back to [the] emergency room or something else." *See id.* at 206. Wellpath's 30(b)(6) witness stated that Ms. Cress did "[n]ot necessarily" need to call a provider at this point. *See* Small Dep. at 80 (Ex. 7 to Devlin Decl.).

## III. Clint Banning Orders Medications for Christina Ryan.

At 5:00 p.m., Ms. Weaver called Mr. Banning, who ordered four medications for Ms. Ryan that she had been prescribed before coming to jail. *See* Weaver Dep. at 79-83 (Ex. 5 to Devlin Decl.); *see also* Mede Dep. Ex. 9, at WP_Ryan_002697 (Ex. 9 to Devlin Decl.). Mr. Banning acknowledged that he usually does not see the patient when he makes phone orders. He explained that "it would be nice that that luxury would be there, for me to be able to assess the patient myself, but I trust the nurse." Mr. Banning testified that "[a]ll I knew [about Ms. Ryan] was the meds she was on." He did not recall any discussion of Ms. Ryan's condition. *Id.* Wellpath's 30(b)(6) witness confirmed that, from its perspective, "[i]t's appropriate" that Mr. Banning was not told anything about Ms. Ryan's condition during this phone call. *See* Banning Dep. at 120 (Ex. 2 to Devlin Decl.).

## IV. Christina Ryan's Condition Worsens

At approximately 5:46 p.m., the deputies began discussing that Ms. Ryan was rolling around in her own excrement. One deputy placed a towel in front of the cell door, while another

deputy sprayed cleaner. *See* video. At 5:58 p.m., Ms. Weaver returned to booking. *See id*. A deputy asked Ms. Weaver to check on Ms. Ryan. Ms. Weaver responded: "I'm actually on my way out."

At 6:00 p.m., two deputies opened Ms. Ryan's cell door to give her a shower. Ms. Weaver came over and stood outside the cell. While Ms. Weaver was watching, the deputies woke Ms. Ryan, who began to roll around on the floor. After looking into Ms. Ryan's cell for less than twenty seconds, Ms. Weaver walked away. *See* video.

At 6:04 p.m., Ms. Weaver returned to booking. *See* video. The deputies had escorted Ms. Ryan to the shower. Ms. Weaver left the jail because her shift had ended. Ms. Weaver acknowledged that Ms. Ryan's condition was "concerning" but did not recall contacting Ms. Cress to make sure that she was going to check on Ms. Ryan. *See* Weaver Dep. at 119-19 (Ex. 5 to Devlin Decl.). Asked what the medical plan was for Ms. Ryan, Ms. Weaver said: "I mean, I would guess the plan would be hopefully she would be sobered up by morning." *See id*.

The Wellpath team had various responses to Ms. Ryan's worsening condition. Mr. Banning testified: "[F]rom what I see and my experience, at this point she does not need a higher level of care." *See* Banning Dep. at 171-172 (Ex. 2 to Devlin Decl.). After viewing the video of Ms. Ryan when she was booked into the jail and the video of Ms. Ryan being taken to the shower, Dr. Bilder testified: "I wouldn't say it's worse." *See* Bilder Dep. at 139-140 (Ex. 1 to Devlin Decl.). Asked if Ms. Weaver should have done something more before she left, Dr. Shah responded: "Yes. Like we discussed earlier, everybody involved in caring for Ms. Ryan should have done more. And more included trying to help her, talking to her, calling 9-1-1 or calling a provider and getting some additional orders, but, yes." *See* Shah Dep. at 217 (Ex. 6 to Devlin Decl.).

At 6:12 p.m., Ms. Cress returned to booking. *See* video. She watched four deputies drag Ms. Ryan from the shower area to Holding Cell 4. *See* video. Ms. Ryan again began making squawking noises once inside the holding cell. She began rolling around on the floor and making jerky movements. *See* video. Ms. Cress left booking at 6:18 p.m. without checking on Ms. Ryan. *See* video.

Asked why she didn't check on Ms. Ryan, Ms. Cress responded: "Well, I did check on her. I saw her. She's more active and she's talking. So what else would you want me to do?" *See* Cress Dep. at 160-161 (Ex. 4 to Devlin Decl.). Asked if Ms. Cress should have checked on Ms. Ryan, Ms. Weaver responded: "Well, I think she just saw her. She just saw her get put in the cell. She's doing the same thing she was, cleaned up." *See* Weaver Dep. at 121 (Ex. 5 to Devlin Decl.). Mr. Banning agreed that Ms. Ryan still did not need a higher level of care. *See* Banning Dep. at 179-180 (Ex. 2 to Devlin Decl.). Asked if Ms. Cress should have done something more for Ms. Ryan at this point, Dr. Shah responded: "Like we discussed earlier, yes, Ms. Ryan needed additional medical help, and it should have been delivered even earlier– at earlier point than even this when Ms. –when the nurse evaluated her earlier." *See* Shah Dep. at 223 (Ex. 6 to Devlin Decl.). He thought that Ms. Cress should have recognized that Ms. Ryan's condition had deteriorated and that loss of bowel control potentially was a sign of a serious medical problem. *See id*. at 223-224. "[N]eed[ing a] higher level of care," meant seeing a doctor either in the jail or at the hospital. *See id*. at 224-225. Wellpath's 30(b)(6) witness testified that Ms. Cress did not need to do anything else for Ms. Ryan and that "the staff members did not break any Wellpath policy." *See* Small Dep. at 95-96 (Ex. 7 to Devlin Decl.).

At 7:16 p.m., Ms. Cress entered booking and remained there for nine minutes. *See v*ideo. She did not look into Ms. Ryan's cell. During that time, Ms. Ryan continued to make squawking

noises. Ms. Ryan was naked, rolling around on the floor and making jerky movements. *See* video.

Ms. Cress completed Wellpath paperwork for Ms. Ryan. First, she completed a Screening Exceptions form to explain why she did not perform the required intake screening of Ms. Ryan. She marked the box for "Other" and wrote: "inmate uncooperative." *See* Mede Dep. Ex. 9, at WP_Ryan_002700 (Ex. 9 to Devlin Decl.). She then completed a Medication Administration Record ("MAR") for Ms. Ryan. She wrote "Pt combative" to explain why she did not give Ms. Ryan her evening medications. *See* Cress Dep. at 101-103 (Ex. 4 to Devlin Decl.); *see also* Mede Dep. Ex. 9, at WP_Ryan_002701-02 (Ex. 9 to Devlin Decl.). Asked why she wrote "inmate uncooperative," even though she did not talk to Ms. Ryan, Ms. Cress responded: "I might have got that from the deputy." *See* Cress Dep. at 169 (Ex. 4 to Devlin Decl.). She added that "she's not in a conversational mood, I guess is the best way to put it." *See id.* at 170. Asked why she wrote "Pt combative,", Ms. Cress responded: "'Combative' is the wrong word. 'Uncooperative' would have been a more true word, so I wish I would have put 'uncooperative.'" *See id.* at 173.

Dr. Shah testified that "for anyone to document that the other person is combative, there needs to be some interaction, and I did not see any interaction." *See id.* at 230-231. He also stated that "[f]or inmate to show ... uncooperative behavior, there should have been a human-to-human interaction, which I did not see." *See id.* at 232. The Wellpath 30(b)(6) witness testified that Ms. Cress did not need to look into the holding cell before filling out the form and "did not break any policy." *See* Small Dep. at 98-100, 103-104 (Ex. 7 to Devlin Decl.). That same witness conceded that it might have been helpful to get another set of vital signs from Ms. Ryan. *See id.* at 111.

Ms. Cress said that she did not contact Dr. Bilder or Mr. Banning because Ms. Ryan was getting better. *See* Cress Dep. at 176 (Ex. 4 to Devlin Decl.). Dr. Shah testified that Ms. Cress

should have gotten a doctor to the jail or sent Ms. Ryan to the hospital. *See* Shah Dep. at 233 (Ex. 6 to Devlin Decl.).

At 7:43 p.m., Ms. Cress returned to booking. She did not look into Ms. Ryan's cell. During this time, Ms. Ryan was not making any noises. *See* video. Ms. Ryan was naked and lying on the floor. *See* video.

Over three hours later, at 10:45 p.m., Ms. Cress returned to booking. *See* video. She did not look into Ms. Ryan's cell. During that time, Ms. Ryan continued to make squawking noises. *See* video. Ms. Ryan was naked, rolling around on the floor and making jerky movements. *See* video. Asked why she didn't look into Ms. Ryan's cell, Ms. Cress responded: "I could hear her." *See* Cress Dep. at 185 (Ex. 4 to Devlin Decl.). Asked if that was sufficient, Ms. Cress replied: "Yes. She's still active." *See id.* at 185-186. Ms. Cress said that she did not attempt to do the receiving screening or offer medications at this point "[b]ecause of the noise that she was making." *See id.* at 186.

While Ms. Cress was standing at the booking desk, Sergeant Bergor took out his cellphone and recorded the noise coming from Ms. Ryan's cell and from another cell in the booking area. *See* video.

One of the deputies said: "You've got a pooper." Deputy O'Dell looked into Ms. Ryan's cell and said: "No." Ms. Cress responded: "She did?" Deputy O'Dell said: "Yeah. She's doing the exact same thing." Deputy O'Dell added: "I can't do that again." The parties dispute whether Ms. Cress responded with either "I wouldn't bug her" or "that little bugger." *Compare* Cress Depo. at 190-191 *with* video. Either way, Ms. Cress stated that she had no concerns about Ms. Ryan, even after learning that she had lost control of her bowels for a second time. *See* Cress Dep. at 190-191 (Ex. 4 to Devlin Decl.). Ms. Weaver agreed that Ms. Cress did not need to call

Dr. Bilder or Mr. Banning. *See* Weaver Dep. at 148 (Ex. 5 to Devlin Decl.). Asked if Ms. Cress should have gotten another set of vital signs at this point, Ms. Weaver responded: "I might have, you know, but she didn't see a need to." Mr. Banning testified that he "can't say whether [Ms. Ryan] needed to see a doctor at that time…. I would have had – it would have been nice if she would have looked at the patient." He added that "[i]t would have been nice to have a set of – another set of vitals at that time." Dr. Bilder had no concerns about Ms. Ryan after viewing the video:

> Q. Okay. And the appropriate way to care for her is to do what– just what they're doing right here, is to just let her flop around on the ground.
>
> A. Yeah.

*See* Bilder Dep.at 163-165 (Ex. 1 to Devlin Decl.).

Dr. Shah testified that "loss of bowel control requires medical attention and needs an evaluation .... Whether it is serious matter or not ... needs to be evaluated and needs to be dealt with accordingly, yes." *See* Shah Dep. at 167-168 (Ex. 6 to Devlin Decl.). He agreed that Ms. Ryan's condition was getting worse and that Ms. Cress should have looked in Ms. Ryan's cell and interacted with her. *See id.* at 238-239. Dr. Shah agreed that it was not appropriate medical advice to tell the deputies not to "bug" Ms. Ryan. *See id.* at 239. He added: "I'm clearly disturbed with what I saw." *See id.* at 240-241. Wellpath's 30(b)(6) witness acknowledged that he "[w]ould have liked to have some additional visualization of– of the patient." *See* Small Dep. at 112-113 (Ex. 7 to Devlin Decl.). He noted, however, that Ms. Cress did not violate any Wellpath policies. *See id.* at 113-114.

At 10:59 p.m., Ms. Cress returned to booking. *See* video. She did not look into Ms. Ryan's cell. During that time, Ms. Ryan continued to make squawking noises. Ms. Ryan was

naked, rolling around on the floor, making jerky movements, and had excrement on her body. *See* video. Ms. Cress testified that she did not look into Ms. Ryan's cell because she could hear Ms. Ryan. *See* Cress Dep. at 199 (Ex. 4 to Devlin Decl.). Asked why she did not take another set of vital signs, Ms. Cress replied: "She's better than she was the last time I took a set of vital signs." *See* video.

At 12:04 a.m., Ms. Cress returned to booking. *See* video. She did not look into Ms. Ryan's cell. During that time, Ms. Ryan continued to make incoherent noises. Ms. Ryan was naked, rolling around on the floor, making jerky movements, and had excrement on her body. *See* video. Ms. Cress explained that she never thought about calling an ambulance for Ms. Ryan because she "thought [Ms. Ryan] would be fine like many others are." *See* Cress Dep. at 203 (Ex. 4 to Devlin Decl.).

At 12:19 a.m., Ms. Cress walked through booking for the last time. *See* video. She did not look into Ms. Ryan's cell. Ms. Ryan continued to make squawking noises. Ms. Ryan was naked, rolling around on the floor, making jerky movements, and had excrement on her body. *See* video. Ms. Cress left the jail because her shift had ended. When she left the jail, Ms. Cress knew that there would be no medical staff on site until 8:00 a.m. *See* Cress Dep. at 202 (Ex. 4 to Devlin Decl.). She did not leave instructions for the deputies regarding Ms. Ryan. *See id.* at 204-05.

Asked if it was acceptable for Ms. Cress not to look into Ms. Ryan's cell at any point after 6:20 p.m., Ms. Weaver expressed little concern but conceded that "probably, maybe, I would have...." *See* Weaver Dep. at 154-155 (Ex. 5 to Devlin Decl.). Mr. Banning said: "There could have been her checking on the patient … and determining whether something else needed to be done." *See* Banning Dep. at 196 (Ex. 2 to Devlin Decl.). Asked if it was acceptable for Ms. Cress not to get another set of vital signs before she left, Ms. Weaver responded: "So a second

set of vitals might have been good." *See* Weaver Dep. at 155-156 (Ex. 5 to Devlin Decl.). Mr. Banning testified that "it would have been important" for Ms. Cress to take Ms. Ryan's vital signs again before she left the jail. *See* Banning Dep. at 194 (Ex. 2 to Devlin Decl.); *see also id.* at 202. Asked if Ms. Cress should have contacted him before she went home, Mr. Banning responded: "With her experience and what she has dealt with in the jail and these types of patients, I don't believe it was wrong." *See id.* at 197. Dr. Shah testified that Ms. Cress should have made sure that Ms. Ryan was sent to the hospital before she left. *See* Shah Dep. at 243 (Ex. 6 to Devlin Decl.). Wellpath's 30(b)(6) witness testified that Ms. Cress's decisions "did not break any Wellpath policy," although he conceded that "it would have been helpful if there was another documented set of vital signs." *See* Small Dep. at 118 (Ex. 7 to Devlin Decl.).

At 5:05 a.m., Sergeant Bergor and Deputy O'Dell looked into Ms. Ryan's cell. *See* Video. Deputy O'Dell called Ms. Ryan's name but got no response. The deputies decided not to give breakfast to Ms. Ryan. The cell video shows that Ms. Ryan was naked and lying facedown on the floor, with her arms and legs moving in a spastic manner. *See* video.

At 5:43 a.m., Deputy Markus Graham looked into Ms. Ryan's cell and said: "It looks like somebody fucking threw her through, like dragged her behind a car." *See* video. At 5:48 a.m., Sergeant Bergor opened the door to Ms. Ryan's cell and initiated the emergency response. *See* video. At 6:04 a.m., EMS personnel declared Ms. Ryan dead.

At 7:51 a.m., Ms. Weaver arrived at the jail. *See* video. Sheriff Craig Zanni and Captain Darius Mede told her that Ms. Ryan had died. Ms. Weaver did not remember whether she spoke with Ms. Cress about Ms. Ryan, but she did recall reviewing the medical chart. *See* Weaver Dep. at 163 (Ex. 5 to Devlin Decl.). Ms. Weaver did not review any video. *See* video.

On November 1, 2019, Deputy State Medical Examiner Dr. James Olson performed an autopsy on Ms. Ryan. *See* Forensic Examination Report (Ex. 12 to Devlin Decl.). Dr. Olson concluded that her cause of death was "Acute Methamphetamine Intoxication." He noted that Ms. Ryan had extensive bruising and was covered in feces. See COUNTY 000975 (Ex. 13 to Devlin Decl.).

**V. Wellpath's Policies and Training.**

Wellpath had a policy entitled "Receiving Screening – Coos OR." *See* Mede Dep. Ex. 19 (Ex. 15 to Devlin Decl.). The earlier policy contains the same basic information. *See* WP_RYAN_010798-010803 (Ex. 16 to Devlin Decl.). This policy identified several criteria for refusing to admit someone to the jail. *See* Mede Dep. Ex. 19 (Ex. 15 to Devlin Decl.). The policy stated that "[h]ealth care staff will continue to attempt completion of the intake screening at each patient encounter or on each shift until successful." *See id*.

Wellpath also had a policy entitled "Medically Supervised Withdrawal and Treatment – Coor OR." *See* Mede Dep. Ex. 20 (Ex. 17 to Devlin Decl.). The earlier policy contains similar information. *See* WP_RYAN_010908-010911 (Ex. 19 to Devlin Decl.). This policy stated: "Any patient incarcerated under the influence of alcohol or drugs shall be housed by custody in as safe a manner as possible and kept under close observation as clinically indicated." *See* Mede Dep. Ex 20 (Ex. 17 to Devlin Decl.). The policy indicated that "any time patients exhibit any of the [listed criteria] they should be sent via ambulance to a licensed acute care facility/emergency room for evaluation and treatment." *See id.* Those criteria included unconscious or semiconscious; mentally unstable; severely intoxicated; in alcohol or drug withdrawal; urgently in need of medical attention; and otherwise clinically unstable.

The policy also stated: "A patient with altered mental status or displaying signs of advanced withdrawal must be evaluated immediately by the [health care provider] or sent via ambulance to a licensed acute care facility or emergency room for evaluation and treatment."

The policy further cites NCCHC Standard J-F-04. *See* Mede Dep. Ex. 20 (Ex. 17 to Devlin Decl.). That Standard notes that "[a]lcohol and/or drug intoxication is a leading cause of death in jails. It requires urgent if not emergent management to prevent complications including death." *See* NCCHC Standard J-G-04 (Ex. 22 to Devlin Decl.). The policy indicated that "[p]atients who report Synthetic Drug use will be evaluated utilizing the Wellpath Synthetic Drug and Other Monitoring Flowsheet." *See* Mede Dep. Ex. 20 (Ex. 17 to Devlin Decl.). That Flowsheet directed medical staff on what data to collect about a person under the influence of a synthetic drug, such as methamphetamine, and when to contact a medical provider. See Cress Dep. Ex. 93, at WP_Ryan_002586 (Ex. 20 to Devlin Decl.).The policy also referenced a Synthetic Drug Practitioner Order Sheet. *See* Mede Dep. Ex. 20 (Ex. 17 to Devlin Decl.). That Order Sheet contained a list of potential orders that a provider might issue for someone under the influence of a synthetic drug, such as methamphetamine. *See* Small Dep. Ex. 12 (Ex. 21 to Devlin Decl.). Wellpath did not begin using the Flowsheet and the Order Sheet at the Coos County Jail until 2021, even though those documents were being used at other Wellpath facilities by October 2019. *See* Small Dep. at 55-63 (Ex. 7 to Devlin Decl.).

In August 2019, both Ms. Cress and Ms. Weaver attended a Wellpath training entitled "Detoxification Training for Nurses and Clinicians." *See* Cress Dep. Ex. 90 (Ex. 24 to Devlin Decl.);see also WP_Ryan_002101-002103 (Ex. 25 to Devlin Decl.). Wellpath produced documents from a training entitled "Detox Training Nurses and Providers," which states: "Date Released April 15, 2019." *See* Cress Dep. Ex. 93 (Ex. 20 to Devlin Decl.). The Detox Training

materials contain references to the Synthetic Drug Practitioner Order Sheet and the Synthetic Drug Monitoring Flowsheet. *See id.*, at WP_Ryan_002585-002586.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## DISCUSSION

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims because (1) Plaintiff cannot prove that any Defendant showed deliberate indifference to her serious medical needs, (2) Plaintiff cannot prove a *Monell* claim against Wellpath, (3) Plaintiffs cannot show Defendants' actions caused the alleged harm to make out a negligence claim under

Oregon law, and (4) punitive damages are inappropriate. Defendants are partly right – they are entitled to summary judgment on the deliberate indifference claim against Defendant Banning because his actions did not cause the alleged increased risk of harm, and the supervisory liability claims against Defendants Shah, Bilder, and Banning. Because the Court finds that there are genuine issues of material fact that preclude summary judgment on Plaintiff's remaining claims, Defendants' motion for summary judgment on those claims is denied.

## I. Deliberate Indifference to Serious Medical Needs

Defendants argue that summary judgment is appropriate because Plaintiff cannot prove that any of Defendants Banning, Weaver, Darnell or Cress showed deliberate indifference to Ms. Ryan's serious medical needs. As an initial matter, the Court notes that Plaintiff's claims arise under the Due Process clause of the 14th Amendment because Ms. Ryan's injuries were sustained while a pretrial detainee. *See Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1246 n.5 (9th Cir. 2016). In the Ninth Circuit, courts evaluate Due Process claims for denial of adequate medical care under an objective deliberate indifference standard. *See Gordon v. City of Orange*, 888 F.3d 1118 (9th Cir. 2018). To prove a Due Process violation based on denial of adequate medical care while a pretrial detainee, a claimant must show that (1) defendants made an intentional decision with respect to the conditions under which the claimant was confined; (2) those conditions put the claimant at substantial risk of suffering serious harm; (3) defendants did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved; and (4) that by not taking such measures, the defendants caused the claimant's injuries. *Gordon*, 888 F.3d at 1125.

Plaintiff alleges that Defendants Rachel Cress, Kathleen Weaver, Clint Banning and Amber Darnell were deliberately indifferent to Ms. Ryan's serious medical needs because they

(1) failed to contact a doctor or nurse when faced with Ms. Ryan's deteriorating condition, (2) failed to provide her with adequate medical care as her condition worsened following admission to the Coos County Jail, and (3) failed to ordered prescription medications with an exam and review of medical records. As explained below, there are disputed material facts about whether Rachel Cress, Kathleen Weaver, and Amber Darnell failed to take reasonable steps (appreciable by a reasonable official), and whether those failures caused the decedent harm. *See Gordon*, 888 F.3d at 1125. This prong must be proved with "a showing of more than negligence but less than subjective intent – something akin to reckless disregard." *Id.* at 1125. Reckless disregard, in turn, requires a showing that a defendant disregarded a risk of harm of which the defendant was aware. *U.S. v. Rodriguez*, 880 F.3d 1151, 1161 (9th Cir. 2018) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Defendants argue that Plaintiff has provided no evidence of an objectively unreasonable decision that caused Ms. Ryan harm.

Beginning with Rachel Cress, the evidence viewed in the light most favorable to Plaintiff shows that Ms. Cress had several opportunities to seek a higher level of care for Ms. Ryan, and that her failure to do so could reasonably have caused Ms. Ryan harm. Under *Gordon*, Plaintiff must show that Ms. Cress "did not take reasonable available measures to abate [a risk of serious harm], even though a reasonable official in the circumstances would have appreciated the high degree of risk involved." *Gordon* , 888 F.3d at 1125. To do so, plaintiff must show that the defendant's actions were "objectively unreasonable," meaning "more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (quoting *Castro*, 833 F.3d at 1071). Ms. Cress was responsible for Ms. Ryan's medical care from the time Ms. Ryan entered the jail until midnight on October 31, 2019. During that time, Ms. Cress observed Ms. Ryan's inability to speak coherently, inability to walk, and repeated loss of bowel control. Yet Ms. Cress

never called Mr. Banning or Dr. Bilder for guidance, never called an ambulance, and did not get a repeat set of vital signs. Applying the *Gordon* framework, a reasonable juror could conclude that a nurse who observed Ms. Ryan's condition, including her inability to speak coherently, inability to walk, and repeated loss of bowel control, would have understood that she faced a "substantial risk of suffering serious harm." *Gordon*, 888 F.3d at 1125. Plaintiff has presented testimony from multiple experts that support the conclusion that further care could have prevented Ms. Ryan's death. *See, e.g.,* Reed Report at 6, Radecki Report, at 5-7, (Exs. 29 & 30 to Devlin Decl.). Based on the evidence and these expert reports, a jury could conclude that Ms. Cress's actions were "akin to reckless disregard." *Id.* Defendants' motion for summary judgment on the deliberate indifference claim against Defendant Cress is denied.

The same is true for Defendants Kathleen Weaver and Amber Darnell. Ms. Weaver observed Ms. Ryan at several points during her short incarceration at Coos County Jail, saw her declining condition, and did not seek further care. Ms. Darnell likewise saw Ms. Ryan less than two hours after she was booked into the jail, when Ms. Ryan was showing signs of medical distress. But Ms. Darnell did not contact a doctor or a nurse, despite her training as an EMT. Plaintiff's expert witnesses offered opinions that further medical care would have prevented Ms. Ryan's ultimate death, and that Ms. Weaver and Ms. Darnell were in a position to observe Ms. Ryan's condition and should have done something to improve it. *See, e.g.*, Reed Report at 6, Radecki Report, at 5-7, (Exs. 29 & 30 to Devlin Decl.). Viewing the evidence in the light most favorable to the Plaintiff, the Court denies the motion for summary judgment on deliberate indifference claims against Kathleen Weaver and Amber Darnell as well.

The Court grants Defendants' motion to dismiss the deliberate indifference claim against Clint Banning, however, because Plaintiff has not adduced any evidence that would meet the

second or fourth *Gordon* factors. Under *Gordon*, a plaintiff must show both that the Defendant created conditions that "put the plaintiff at substantial risk of suffering serious harm" and that Defendant's failure to take reasonable available measure to abate that risk caused the plaintiff's injuries. *Gordon*, 888 F.3d at 1125. Neither is true for Clint Banning. NP Banning's only involvement in Ms. Ryan's care during her confinement was to confirm the suitability of the medications Ms. Ryan brought with her to the Coos County jail. Deposition of Clint Banning ("Banning Dep."), Ex. 9 to Coit Decl., at 134, 167. NP Banning verbally approved the administration of Ms. Ryan's medications in accordance with their prescription from Ms. Ryan's prescribing physician. SAC ¶ 74. But Ms. Ryan was not given any medication while confined in the jail. Litchfield Decl., Exhibit 3, Jail Records, pp. 7-8. NP Banning was not involved in providing or directing the medical care Ms. Ryan received, had no knowledge of Ms. Ryan's declining condition, and was not consulted on the issue of transferring Ms. Ryan to the hospital. In short, NP Banning did not create a condition that put Ms. Ryan at risk of harm, had no way of knowing she would have needed further medical care, and therefore did not recklessly disregard a risk of harm to Ms. Ryan. *See Gordon,* 888 F.3d at 1125. Because there is an absence of evidence from which a reasonable juror could conclude NP Banning was liable on plaintiff's deliberate indifference claim, the Court grants Defendants' motion for summary judgment for Clint Banning on the First Claim for Relief.

## II. Supervisory Liability

State officials are not vicariously liable for the actions of their subordinates. *Monell v. Dept. of Soc. Serv. of New York*, 436 U.S. 658, 694 (1978). A supervisor is liable under § 1983 only "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the

constitutional violation." *Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 798 (9th Cir. 2018). To make that showing, Plaintiff must establish the supervisor's "'own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.'" *Keates v. Koile*, 883 F.3d 1228, 1243 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)).

Plaintiff alleges that Dr. Shah, Dr. Bilder, Mr. Banning, and Ms. Weaver[2] should be liable for (1) failure to train and/or supervise Wellpath's employees on, among other things, "inmates experiencing drug overdose or withdrawal," and (2) approval of and ratification of the policies, customs or practices that led to Ms. Ryan's death. SAC ¶¶ 215-16, Resp. at 35.

First, Plaintiff does not show that Dr. Shah,[3] Dr. Bilder, or Mr. Banning were personally involved in the alleged custom of admitting severely intoxicated people into the jail and offers no facts establishing their acquiescence in this practice. Likewise, on the failure to train theories, Plaintiff provides no evidence that Dr. Shah, Dr. Bilder, or Mr. Banning directed, or were supposed to direct, Wellpath's staff training and were therefore the actual or proximate cause of the injury or culpable for these alleged failures. Plaintiff argues that Wellpath failed to adequately train its employees, but does not establish that these individual supervisors were charged with ensuring that training occurred. *See* SAC ¶¶ 215-16, Resp. at 35-40. This is unlike *Starr v. Baca*, where the supervising sheriff was charged with prisoner's safekeeping by law and had knowledge of the problem, but failed to act to remedy unconstitutional conditions in the jail.

[2] Defendants do not move for summary judgment on the supervisory liability claim against Ms. Weaver. *See* Mot. for Summ. J. at 23-25.
[3] Indeed, as Plaintiff argues in his response brief, "[t]he best evidence of Dr. Shah's supervisory failure is what happened *after* Ms. Ryan's death." Resp. at 40 (emphasis added).

652 F.3d at 1208. Here, by contrast Plaintiff does not provide evidence of personal involvement, acquiescence, culpability, or a sufficient causal connection to create a question of fact for the jury on these claims. The Court finds that Defendants Dr. Shah, Dr. Bilder, and Mr. Banning are entitled to summary judgment on the supervisory liability claims against them.

## III. *Monell* Claim

Defendant Wellpath LLC is a private entity performing a government function. Therefore, Plaintiff's claim can survive summary judgment if there is a genuine dispute of material fact as to whether the execution of the entity's official policy or unofficial custom violated Plaintiff's constitutional rights. *Monell v. Dept. of Soc. Serv. of New York*, 436 U.S. 658, 694 (1978) (discussing § 1983 claims against local government entities); *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities performing a government function). Under *Monell*, the requisite elements of a § 1983 claim against an entity like Defendant is the following: (1) the plaintiff was deprived of a constitutional right; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

The challenged policy or custom "may not be proved through reference to a single unconstitutional incident unless proof of the incident includes proof that it was caused by an existing unconstitutional policy." *Rogan v. City of Los Angeles*, 668 F. Supp. 1384, 1395 (C.D. Cal. 1987) (internal quotation marks and alteration omitted). An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)).

"Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Further, a municipality or private entity performing a state function "may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010) (internal quotation marks omitted), *overruled in part on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016) (en banc). A *Monell* claim may not rest on the mere fact that an entity's employees all acted in a similar way—instead, there must be evidence of a causal connection between that action and a policy or custom of the entity.

Plaintiff identifies seven policies, customs or practices that Mr. Banning, Ms. Weaver and/or Ms. Cress followed, which resulted in a violation of Ms. Ryan's Constitutional rights. To succeed on the *Monell* claim, Plaintiff must show Defendant's policy or custom amounted to deliberate indifference to Ms. Ryan's constitutional rights, and was the moving force behind the constitutional violation. *Mabe*, 237 F.3d at 1110–11. Viewing the evidence in the light most favorable to Plaintiff, there is a question of material fact as to whether Defendant Wellpath LLC's policies and customs related to treatment of intoxicated individuals were a direct cause of Ms. Ryan's death. The individual Defendants admitted the existence of these policies and practices in their depositions, and Wellpath's 30(b)(6) witness confirmed that its employees acted in line with either written policy or accepted practice. The Court has already found issues of material fact remain as to whether the individual defendants' actions caused Ms. Ryan's death.

A reasonable juror could likewise conclude that Wellpath's policies and practices were deliberately indifferent to the risk of harm to Ms. Ryan, and that the deliberate indifference baked into Wellpath's policies and practices was a cause of Ms. Ryan's death. The Court denies Defendants' motion for summary judgment on the *Monell* claim.

**IV. State Law Claims**

Plaintiff alleges state law negligence (Claim Four) and gross negligence (Claim Five) claims against Wellpath on the same bases as his deliberate indifference claims. *See* SAC ¶¶ 221-29. To prevail on a common-law negligence claim under Oregon law, a plaintiff must prove:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiffs harm, and (5) that plaintiff was within the class of persons and plaintiffs injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495, 506, 244 P.3d 835 (2010) (citations omitted). Thus, a defendant is liable only for the foreseeable consequences of their negligence "unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty." *Fazzolari By & Through Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17, 734 P.2d 1326 (1987). Gross negligence requires a plaintiff to show the added element that defendant acted with "reckless disregard of safety or indifference to the probable consequences of its acts." *Crapser v. NaphCare, Inc.*, 2023 WL 7003701, at *10 (D. Or. Oct. 24, 2023) (internal citations and quotations omitted).

For the reasons indicated above, the Court finds Defendants are not entitled to summary judgment on Plaintiff's state law claims. Defendants argue Plaintiff has failed to provide evidence from which a reasonable juror could conclude their actions were a cause of Ms. Ryan's death. Mot. for Summ. J. at 25. As evidence, Defendants rely on their expert witnesses – Kathryn

Wild and Dr. Alfred Joshua – to argue that there is insufficient evidence that they were aware of the risk to Ms. Ryan's health, or that their failure to provide further medical care was unreasonable. *Id.* But Plaintiff has his own experts who disagree. *See, e.g.*, Reed Report at 6, Radecki Report, at 5-7, (Exs. 29 & 30 to Devlin Decl.). And, as discussed in more detail above, there is a dispute of material fact over the extent to which the Defendants knew Ms. Ryan needed further medical care, and the extent to which their failure to act contributed to her death. Because Defendants have not shown an absence of disputed material facts on causation for Plaintiff's state law claims, or otherwise carried their burden to show they are entitled to judgment as a matter of law on these claims, the Court denies summary judgment on Plaintiff's state law negligence and gross negligence claims.[4]

**CONCLUSION**

For the reasons above, Defendants' motion for summary judgment (ECF No. 83) is GRANTED IN PART and DENIED IN PART.

DATED this 29th day of September 2026.

MUSTAFA T. KASUBHAI (he/him)
United States District Judge

[4] Defendants also move for summary judgment on "the claims for punitive damages." Mot. for Summ. J. at 31. In the Second Amended Complaint Plaintiff seeks punitive damages on his *Monell* and gross negligence claims. SAC at 58-59. As the Court indicates above, there are disputed material facts on both these claims, and Defendants are not entitled to judgment as a matter of law. These same disputed material facts concerning the extent of Defendants' reckless disregard for Ms. Ryan's health preclude Defendants' motion for summary judgment on requests for punitive damages as well. Reading the record in the light most favorable to Plaintiff, a reasonable juror could find that Defendants acted with a conscious indifference to Ms. Ryan's health, and could award punitive damages in Plaintiff's favor. *See, e.g.*, *Ibanez v. Bettazza*, No. 3:11-cv-01518-SI, 2013 WL 1295219, at *4 (D. Or. Mar. 28, 2013) (denying a motion for summary judgment on punitive damages claim based on evidence that defendant drove a semi-truck with double trailers "at more than twice the maximum safe speed" with knowledge that the brakes on the second trailer were malfunctioning).